Judgment rendered June 29, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,573-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                              Appellee

versus

AURTHEAL T. EVANS                              Appellant

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 16-F2713

Honorable C. Wendell Manning, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Lieu T. Vo Clark

ROBERT S. TEW                                Counsel for Appellee
District Attorney

HOLLY CHAMBERS-JONES
Assistant District Attorney

* * * * *

Before PITMAN, STEPHENS, and ROBINSON, JJ.

**PITMAN, J.**

A jury convicted Defendant Aurtheal T. Evans of attempted manslaughter, first degree rape, second degree kidnapping and failure to register and/or update registration as a sex offender. The trial court sentenced him to consecutive sentences of 20 years at hard labor for attempted manslaughter; life in prison at hard labor without benefit of parole, probation or suspension of sentence for first degree rape; 40 years at hard labor without benefit of parole, probation or suspension of sentence for second degree kidnapping; and ten years at hard labor without benefit of parole, probation or suspension of sentence and a $1,000 fine for failure to register and/or update registration as a sex offender. Defendant appeals. For the following reasons, we affirm his convictions and sentences for first degree rape and failure to register and/or update registration as a sex offender. Pursuant to *Ramos v. Louisiana*, 140 S. Ct. 1390, 206 L. Ed. 2d 583 (2020), and the fact that this matter is on direct appeal, we vacate Defendant's convictions and sentences for attempted manslaughter and second degree kidnapping and remand for further proceedings.

## FACTS

On February 16, 2017, a grand jury indicted Defendant for attempted second degree murder, first degree rape, second degree kidnapping and failure to register and/or update registration as a sex offender.[1] It alleged that he committed the first three counts between the dates of September 12 and September 17, 2016, and that the victim was T.B. It alleged that he

---

[1] The original bill of indictment also included a charge of aggravated assault, but this charge was removed in an amended bill of indictment.

committed the fourth count between the dates of May 11, 2016, and September 20, 2016. Defendant pled not guilty.

A jury trial began on December 1, 2018. T.B. testified that she and Defendant began dating in November 2015, fell in love within a few weeks and had the "perfect" relationship. In May 2016, Defendant moved into a trailer on DeSiard Street in Monroe that belonged to Denise Washington, and T.B. stayed there with him for weeks at a time. T.B. testified that on the evening of September 12, 2016, her cousin drove her to Defendant's trailer to bring him groceries. T.B. did not intend to stay the night, but she agreed to stay when Defendant asked. She explained others were present when she arrived, but everyone soon left except for Gonzalo Campos and Isai Rivera. She and Defendant went to his bedroom. Defendant approached her in a "mean" way and asked if she had anything to tell him; she responded that she did not; and he said he would ask her one more time and then slapped her on the face. He slapped her again, and she fell into the closet. She stood up, and he began punching her on the chest, sides and face. She swung at him to try to stop him, but he continued punching her. He then told her "I got something for you" and left the bedroom. He returned with a butcher knife and pushed her onto the bed, pinned her down by straddling her and putting his knees on her arms and held a knife over her. She testified that he told her he could kill her and get away with it. He poked the inside of her ear with the knife and cut her ear. He pinned her down for several minutes, and she struggled with him until he let her up. Defendant then hit her in the face with an aerosol can, and "everything just went out." She became disoriented and lost consciousness and blood began "gushing" from her face. She testified that he said "'f' your face" as he struck her. Her right eye

2

swelled shut, her nose was broken and her scalp was "busted." He also struck her arm at least five times with the can, and her arm became numb, her arm and fingers swelled and pockets of pus formed on her arm. Her blood got onto the bedsheets, and she identified photographs of the sheets and noted where blood on the sheets was from her face and where it was her menstrual blood. She testified that after Defendant stopped hitting her, they lay down on the bed, and he asked to have sexual intercourse with her. She explained that she was afraid of Defendant because he had just threatened to kill her and that she had intercourse with him because she felt like she did not have the choice to say no and was under duress.

T.B. testified that the next morning she wanted to go to the hospital because she was in pain, but Defendant refused to take her and would not allow her to use her cellphone to call anyone. When her son called, Defendant told her to tell him that she was out of town. She stated that her pain worsened, she could not see out of her swollen eye, her arm was still swollen and she could not walk without assistance. She wanted to call an ambulance, but Defendant would not let her because he was worried about going to jail. She noted that Washington came to the bedroom door and spoke with Defendant, but T.B. did not speak up because she was afraid. She testified that on September 16, 2016, Defendant agreed to let her leave and dropped her off at her daughter's house. Her daughter then took her to a hospital in Monroe.

T.B. could not recall much of what happened after she arrived at the hospital, but she knew that she woke up intubated in a Shreveport hospital. While in the hospital, she told a Sexual Assault Nurse Examiner that she had been sexually assaulted. T.B. had two surgeries on her eye, which saved her

3

vision, and two or three surgeries on her arm for compartment syndrome. Photographs of her injuries were shown to the jury.

T.B. further testified that after three weeks in the hospital, she went to a rehabilitation facility. While at the facility, she was interviewed by Det. Duane Cookson of the Monroe Police Department, and she testified that this statement was consistent with her trial testimony. She stated that when she left the hospital, she was still in love with Defendant, he was sorry and they were "going to try to work it out." She admitted that at a pretrial hearing she gave different testimony than at trial because she was in love with Defendant and did not want him to go to jail. She explained that after the pretrial hearing, she knew she had to be truthful and honest with herself because she was "getting played" by Defendant. She testified that she told the jury "exactly" what happened to her.

On cross-examination, T.B. agreed that at a pretrial hearing she stated that she voluntarily had intercourse with Defendant, but she explained that she felt like she did not have a choice. She also agreed that at the hearing she stated that Defendant did not kidnap her, and she explained she did not have the strength to go anywhere and that Defendant never left her alone. She stated that she knew Defendant had committed crimes but that she loved him and wanted to save him from going to jail.

Dr. William Byrd, an ophthalmologist at LSU Health Sciences Center in Shreveport, was accepted as an expert in the fields of ophthalmology and oculoplastic surgery. He examined T.B.'s eye when she was brought to the hospital and stated that her injuries were consistent with being hit in the face with a blunt object. He described photographs of the injured area around her eye, noting lacerations and areas of necrotic tissue on the upper and lower

4

eyelids caused by infection and a loss of blood supply to the area. He stated there was a concern she might lose vision in her eye and that she might lose her eyelids. During two surgeries, physicians removed dead tissue and grafted skin from her collarbone to her eyelids. Dr. Byrd considered the surgeries to be successful and noted that T.B. did not lose her vision.

Dr. Navdeep Samra, a trauma surgeon at Ochsner LSU Health Shreveport, was accepted as an expert in the fields of general surgery and surgical critical care. He became involved in T.B.'s case on September 17, 2016, when she was transferred from a hospital in Monroe to the emergency room in Shreveport and he was the trauma surgeon on call. He stated that she had sustained a polytrauma, i.e., trauma to multiple areas, and described injuries to her face and right upper extremity, i.e., her arm. He identified photographs of T.B.'s injuries, noting the injury to her eye and the swelling and blistering of her right arm and hand. He diagnosed the injuries to her arm as traumatic compartment syndrome and a cutaneous abscess and stated that her injuries were consistent with being hit by an object. He testified that the injury to her arm was so concerning that she was taken immediately into surgery to relieve the pressure in the arm and to drain a subcutaneous abscess. He explained that without treatment, the muscles in her arm could have died and the nerves could have been damaged. Over the next ten days, Dr. Samra performed three additional surgeries on T.B. to close and manage the wound. He stated that T.B. recovered well from compartment syndrome.

Melanie Hubbard, a forensic nurse examiner, was accepted as an expert in the field of Sexual Assault Nurse Examination. On September 18, 2016, she came into contact with T.B., who was in the intensive care unit. T.B. was intubated and could not speak but, instead, communicated by

mouthing words and moving her head. Hubbard asked T.B. if she had been sexually assaulted, and T.B. nodded her head. Hubbard asked T.B. if she wanted to be examined, and T.B. nodded her head. Hubbard did not conduct the examination at this time due to T.B.'s overall condition and the knowledge that the examination would be painful. Hubbard also received consent to perform the examination from T.B.'s family, and T.B.'s son asked that the examination be performed the next morning so T.B. could rest. Hubbard noted that another nurse noticed an odor coming from T.B.'s genitalia, which caused them concern knowing that she had been sexually assaulted.

Morgan Matlock, a forensic nurse examiner, was accepted an expert in the field of Sexual Assault Nurse Examination. She examined T.B. on September 19, 2016, while she was in the intensive care unit. T.B. was unable to speak because she was intubated but was conscious and could respond to commands and answer questions by nodding or squeezing Matlock's hand. T.B. indicated that she had been sexually assaulted, but Matlock could not ask her any details of the assault or of T.B.'s actions following the assault, including if she had showered or used the restroom. Matlock took photographs during the examination, which were shown to the jury. She also collected DNA evidence from T.B.'s external and internal genitalia and from her fingernails. Matlock noted that T.B. had been catheterized, and the cleaning solution used to sterilize the area would have destroyed evidence on the exterior of T.B.'s vagina. She noted petechiae on T.B.'s cervix and microabrasions at her vaginal opening, both of which were consistent with sexual assault or consensual intercourse. Matlock testified that she did not know how much time elapsed between the alleged sexual

6

assault and her examination of T.B. and explained that five days is the guideline for the time within which to collect evidence.

Isai Rivera, through an interpreter, testified that on September 12, 2016, he lived in a trailer on DeSiard Street with Washington, Campos and Defendant. A woman arrived with groceries for Defendant, and he later heard loud voices coming from Defendant's bedroom and heard Defendant say he was going to get a knife. He noted that he heard them arguing on previous occasions. Rivera testified that he never spoke to the woman, that he once saw her go to the bathroom and that he did not see her leave Defendant's bedroom again until she left the trailer five or six days later.

Gonzalo Campos, through an interpreter, testified that on September 12, 2016, he lived in a trailer on DeSiard Street with his wife (Washington), Rivera and Defendant. He stated that T.B. stayed with Defendant "all the time." He saw T.B. leave the trailer with Defendant's help and knew that she had been inside six or seven days. He explained that he could hear her and saw her leave the bedroom to go into the bathroom several times. He stated that Defendant and T.B. fought regularly, but he did not hear any arguments the week T.B. stayed in the trailer.

Denise Washington testified that Defendant is her cousin, and he moved into her trailer on DeSiard Street on May 18, 2016. She stated that T.B. came to the trailer on September 12, 2016, with groceries for Defendant. Washington noted that family and friends were in and out of the trailer that evening and that she left and did not come home until the next morning. When she returned, her husband told her that Rivera heard Defendant and T.B. arguing. She went to Defendant's bedroom to see what was going on. She asked Defendant if they had been arguing, and he

7

responded "no" and that she could ask T.B. She saw T.B. lying in bed and asked her if Defendant had put his hands on her. T.B. responded "no," and Washington stated that she told T.B. "you wouldn't tell me if he did." She testified that she did not see T.B. leave the bedroom or leave the trailer. On September 20, 2016, Washington asked Defendant to move out.

Det. Cookson testified that he was assigned to T.B.'s case. A report was made to the Monroe Police Department on September 18, 2016, and he contacted the hospital on September 26, 2016, to determine T.B.'s status. He learned that T.B. presented to a hospital in Monroe on September 16, 2016, at approximately 10:30 p.m.; that she was then taken to a hospital in Ruston; and then on September 17, 2016, she was taken to a hospital in Shreveport by air ambulance. He had to wait to interview T.B. because of her injuries and the medication she was taking. He received a call on October 6, 2016, from someone with knowledge of T.B.'s condition, Defendant's involvement and Defendant's location. He was unable to locate Defendant but learned he had been living on DeSiard Street with Washington. He contacted Washington, who confirmed Defendant lived with her until September 20, 2016. Law enforcement searched the trailer on October 6, 2016, and he identified photographs taken of the scene. Law enforcement collected the bedsheets and swabbed possible blood samples from the mattress, the corner of the bed and the floor.

Det. Cookson further testified that he interviewed T.B. at a rehabilitation facility on October 7, 2016. She reported that on September 12, 2016, she went to the trailer where Defendant was staying and that he slapped her, knocked her into a door, threatened to beat her all night and struck her about the head, face, chest and torso. T.B. stated that

8

Defendant hit her on the face with an aerosol can, that she raised her arm in an attempt to protect herself and that she lost consciousness three times. She reported that Defendant held her down while holding a knife and told her that he would kill her and get away with it. She also stated that she reluctantly had sexual intercourse with Defendant because she was afraid he would injure her further or kill her. She said that Defendant monitored her phone and would not allow her to call 911. She confirmed to him that she left the trailer on September 16, 2016, and that her daughter took her to the hospital.

Det. Cookson also interviewed Washington, Campos and Rivera. Washington recalled that T.B. arrived with groceries and went to Defendant's bedroom; that Campos told her that Rivera heard a commotion coming from Defendant's bedroom; and that she confronted Defendant, who responded that nothing happened. When Det. Cookson spoke with Campos, he stated that he had no first-hand knowledge of the situation other than that T.B. arrived at the trailer on September 12, 2016, and left on September 16, 2016. When he spoke with Rivera, Rivera stated that he heard a commotion in Defendant's bedroom and that Defendant left the bedroom to retrieve a knife from the kitchen.

Det. Cookson further testified that Defendant was arrested in Arkansas on October 18, 2016. He obtained a search warrant and obtained buccal swabs from Defendant as reference samples of his DNA.

Katie Traweek, a DNA analyst at the North Louisiana Crime Lab, was accepted as an expert in the field of forensic DNA analysis. She received DNA reference samples from T.B. and Defendant, a physical evidence recovery kit collected by Matlock and swabs of suspected blood collected

from Defendant's bedroom. When analyzing swabs from the recovery kit, she discovered the presence of prostate specific antigens, i.e., a component of semen, on the swab of T.B.'s external genitalia and within her vaginal washing sample. The antigens were not compared to reference samples. Traweek tested a swab taken from the corner of Defendant's bed and determined that the substance was blood and was consistent with T.B.'s DNA profile. She tested swabs of suspected blood and semen taken from Defendant's bedsheets. She determined that the blood was consistent with T.B.'s DNA profile and that epithelial cells and prostate specific antigens on the sheets were consistent with Defendant's DNA profile.

Sgt. Mike Swallow of the Ouachita Parish Sheriff's Office was accepted as an expert in the field of fingerprint analysis and identification. He identified a fingerprint card of Defendant taken by the Kansas City Police Department in May 2000, and a booking affidavit fingerprint card from Defendant's arrest for the charges at issue in this case. He compared the fingerprints on the cards and determined that they matched.

Pam Myers of the Morehouse Parish Sheriff's Office testified that she registers sex offenders. She identified Defendant in court and stated that she had known him since 2009 when he registered as a sex offender in her office. She explained that Defendant was required to register as a sex offender due to a 2000 conviction for second degree statutory rape in Missouri. He reported to her yearly from 2009 to 2016 to update his personal information, including his address, and the last time she saw him was August 31, 2016. She stated that a registration requirement for sex offenders is that they give notice of a change of address within three days of moving and that a "move" is defined as being absent from the registered

address for more than 30 days of a year. She stated that from May 18, 2016, to September 20, 2016, Defendant did not notify her of his new address on DeSiard Street, which was a violation of his registration requirements.

On December 6, 2018, the jury returned its verdicts. As to the charge of attempted second degree murder, a nonunanimous jury found Defendant guilty of the responsive verdict of attempted manslaughter. A unanimous jury found Defendant guilty as charged of first degree rape. A nonunanimous jury found Defendant guilty as charged of second degree kidnapping. A unanimous jury found Defendant guilty as charged of failure to register and/or update registration as a sex offender.

A sentencing hearing was held on May 23, 2018. The trial court sentenced Defendant to consecutive sentences of 20 years at hard labor for attempted manslaughter; life in prison at hard labor without benefit of parole, probation or suspension of sentence for first degree rape; 40 years at hard labor without benefit of parole, probation or suspension of sentence for second degree kidnapping; and ten years at hard labor without benefit of parole, probation or suspension of sentence and a $1,000 fine for failure to register and/or update registration as a sex offender. Through a Louisiana Uniform Abuse Prevention Order, the trial court ordered that Defendant have no contact with T.B. for life. It also provided Defendant with a sex offender registration packet and notice.

Defendant appeals.

**DISCUSSION**

*Nonunanimous Jury Verdicts*

In his first assignment of error, Defendant argues that the jury's nonunanimous verdicts for attempted manslaughter and second degree

11

kidnapping should be declared invalid, citing *Ramos*, *supra*. The state concedes that Defendant is entitled to a new trial on these convictions.

In *Ramos*, *supra*, the United States Supreme Court held that the Sixth Amendment's right to a jury trial, as incorporated by the Fourteenth Amendment, requires a unanimous verdict to convict a defendant of a serious offense in both federal and state courts. As a result, the state will have to retry any defendant convicted of serious offenses by nonunanimous juries and whose cases are still pending on direct appeal. *State v. Corn*, 52,867 (La. App. 2 Cir. 7/8/20), 299 So. 3d 749, *writ denied*, 20-00928 (La. 11/10/20), 303 So. 3d 1040.

The present matter was pending on direct review when *Ramos*, *supra*, was decided; and, therefore, its holding applies. *State v. Richardson*, 20-00175 (La. 6/3/20), 296 So. 3d 1050, *citing Griffith v. Kentucky*, 479 U.S. 314, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987). A review of the written jury polling slips indicates that the verdicts for attempted manslaughter and second degree kidnapping were not unanimous, i.e., the jury voted eleven to one on both counts. This is error patent on the face of the record. La. C. Cr. P. art. 920(2); *Corn*, *supra*.

Accordingly, we vacate Defendant's convictions and sentences for attempted manslaughter and second degree kidnapping. He is entitled to a new trial on both charges.

*Sufficiency of the Evidence*

In his second assignment of error, Defendant argues that the evidence is insufficient to convict him of first degree rape. He contends an hour elapsed from the time of his alleged actions of slapping T.B., cutting her with a knife and hitting her with an aerosol can until the time she consented

to have sexual intercourse with him.  He states that at the time he asked T.B. to have intercourse, he was not armed with a dangerous weapon and did not threaten her with great bodily harm to prevent her from resisting.

The state argues that the evidence presented at trial was sufficient to support Defendant's conviction.  It contends that T.B. was prevented from resisting by threats of great and immediate bodily harm, accompanied by apparent power of execution.

The standard of appellate review for a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Hearold*, 603 So. 2d 731 (La. 1992).  *See also* La. C. Cr. P. art. 821.  This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder.  *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517.

The sole testimony of a sexual assault victim is sufficient to support a requisite factual finding.  *State v. Watson*, 32,203 (La. App. 2 Cir. 8/18/99), 743 So. 2d 239, *writ denied*, 99-3014 (La. 3/31/00), 759 So. 2d 69.  The testimony of one witness is sufficient to prove the elements of an offense even when the state does not introduce medical, scientific or physical evidence to prove the commission of the offense by the defendant.  *State v. Turner*, 591 So. 2d 391 (La. App. 2 Cir. 1991), *writ denied*, 597 So. 2d 1027 (La. 1992).

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness.  *State v. Casey*, 99-0023 (La. 1/26/00),

13

775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). A reviewing court may not impinge on the fact finder's discretion unless it is necessary to guarantee the fundamental due process of law. *Id*. The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/02), 827 So. 2d 508.

La. R.S. 14:42(A)(2) defines first degree rape as follows:

A. First degree rape is a rape committed . . . where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:

(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.

Viewing the evidence in the light most favorable to the prosecution, the state presented sufficient evidence at trial to convict Defendant of the first degree rape of T.B. It proved that the intercourse between Defendant and T.B. was without her consent because Defendant prevented her from resisting by threats of great and immediate bodily harm, accompanied by apparent power of execution. At trial, T.B. testified that prior to initiating sexual intercourse with her, Defendant slapped her, punched her, pinned her down, cut her ear with a knife and hit her in the face and arm with an aerosol can. She also stated that he told her he could kill her and get away with it. She testified that she felt she could not say no to Defendant's request to have intercourse because she was afraid of him after he physically harmed her and threatened to kill her. T.B.'s testimony was corroborated by the medical

14

professionals who also testified at trial. Both forensic nurse examiners stated that when they met with T.B. in the hospital, she indicated that she had been sexually assaulted. Doctors Byrd and Samra confirmed the seriousness of T.B.'s injuries. The jury clearly found T.B.'s testimony to be credible, and her testimony alone was sufficient to prove the elements of first degree rape.

Accordingly, this assignment of error lacks merit.

## CONCLUSION

For the foregoing reasons, we affirm Defendant Aurtheal T. Evans's convictions and sentences for first degree rape and failure to register and/or update registration as a sex offender. We vacate his convictions and sentences for attempted manslaughter and second degree kidnapping and remand the matter for further proceedings.

**AFFIRMED IN PART; VACATED IN PART; REMANDED FOR FURTHER PROCEEDINGS.**